UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JODI L. MELTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-01184-TWP-MJD |
| | ) |
| CAROLYN W. COLVIN, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Jodi Melton ("Ms. Melton") requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Commissioner of Social Security ("Commissioner"), wherein the Commissioner denied her application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. For the reasons stated below, the Court **AFFIRMS** the Commissioner's final decision.

**I. BACKGROUND**

**A.    Procedural History**

On October 17, 2011, Ms. Melton filed applications for DIB and SSI under Subchapters II and XVI of the Social Security Act.[1] *See* 42 U.S.C. §§ 416(i), 423(d), 1382 (2012). (Filing No. 12-2 at 12.) Ms. Melton alleges disability due to a "mild mental[] handicap[]", which appears grounded in Ms. Melton's myriad of mental health diagnoses, including major depressive disorder, generalized anxiety disorder, borderline personality disorder, and psychotic disorder Not

---

[1] Although the ALJ noted that Ms. Melton applied for child disability benefits, the ALJ applied the five-step sequential evaluation used for assessing adult disability. On appeal, neither Ms. Melton nor the Commissioner assert that this was done erroneously. Accordingly, this Court considers any unraised objections to the ALJ's use of the five-step evaluation, if there are any, to be deemed waived. *See Boyanowski v. Colvin*, 1:12-CV-139, 2013 WL 3353947, at *8 (N.D. Ind. 2013) ("Undeveloped arguments may be treated as waived based on the concern that they provide an opposing party insufficient notice to respond") (citing *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011)); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

Otherwise Specified (NOS).  (Filing No. 12-2 at 13; Filing No. 12-6 at 21; Filing No. 12-8 at 51.) On November 21, 2011, Ms. Melton's application was denied initially; and, on February 1, 2012, Ms. Melton's application was denied upon reconsideration.  (Filing No. 12-2 at 12.)

Thereafter, on April 12, 2013, an Administrative Law Judge ("ALJ") held a hearing, wherein Ms. Melton appeared with counsel.  (Filing No. 12-2 at 31.)  On May 24, 2013, the ALJ issued a decision, concluding that Ms. Melton was not disabled under the Social Security Act.  (Filing No. 12-2 at 12-26.)  Therein, the ALJ opined that Ms. Melton retained the Residual Functional Capacity ("RFC") to perform other work that existed in significant numbers in the national economy, including a dishwasher and laundry worker.  (Filing No. 12-2 at 25.)  On May 20, 2014, the Appeals Council denied Ms. Melton's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (Filing No. 12-2 at 1-3.)

On July 16, 2014, Ms. Melton filed her Complaint in this Court, requesting judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g)(2012).  (Filing No. 1.) On November 18, 2014, Ms. Melton filed her opening brief.  (Filing No. 17.)  On February 10, 2015, the Commissioner filed a response brief.  (Filing No. 23.)  On February 24, 2015, Ms. Melton filed a reply brief.  (Filing No. 24.)

**B.     Medical History**

Ms. Melton was born August 17, 1992 and she was one day shy of 18th birthday on her alleged disability onset date of August 16, 2010. She obtained a high school diploma from a home school program and had brief past work experience as a food server at a nursing home, a cashier job and a shipping clerk for one day.

On July 10, 2009, psychologist Rosalind Schmutte ("Dr. Schmutte") evaluated Ms. Melton, diagnosing her with mood disorder not otherwise specified ("NOS"), conduct disorder, history of

alcohol abuse, history of cannabis abuse, and borderline intellectual functioning. (Filing No. 12-7 at 65-75.) Dr. Schmutte also assigned Ms. Melton a global assessment of functioning ("GAF") score of 50. (Filing No. 12-7 at 75.) Dr. Schmutte noted that Ms. Melton was taking a mood stabilizer but that she denied having a history of symptoms that would be suggestive of thought disorder or psychosis. (Filing No. 12-7 at 66-67.) On mental status examination, Dr. Schmutte noted that Ms. Melton presented with low average cognitive skills; was alert, oriented, and able to recall personal information; provided appropriate responses to questions assessing social judgment and abstract thinking; exhibited intact short-term memory with no evidence of attentional impairment, unremarkable mood, and dry affective presentation; presented as immature for her reported age socially; and had poor insight. (Filing No. 12-7 at 74.)

In November 17, 2011, Kari Kennedy, Psy.D. ("Dr. Kennedy"), reviewed the medical evidence and concluded that Ms. Melton had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Filing No. 12-8 at 29-40.) Further, as part of a RFC assessment, Dr. Kennedy concluded that Ms. Melton was moderately limited in her abilities to understand and remember detailed instructions; to carry out very short and simple instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete normal workday and workweek without interruptions from psychologically based symptoms; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to appropriately adapt to changes in the work setting. (Filing No. 12-8 at 43-44.)

Finally, Dr. Kennedy opined that Ms. Melton was capable of unskilled work and retained the ability to understand, carry out and remember simple instructions; to make judgments

commensurate with functions of unskilled work; to respond appropriately to brief supervision and interactions with coworkers and work situations; and to deal with changes in a routine work setting. (Filing No. 12-8 at 45.) On January 30, 2012, F. Kladder, Ph.D., reviewed all the evidence in the file and affirmed Dr. Kennedy's assessment. (Filing No. 12-8 at 47.)

On March 1 and March 8, 2012, social worker Kim Heizer, MSW, LCSW, evaluated Ms. Melton and noted that Ms. Melton was taking Citalopram and Seroquel and was struggling with issues related to sleeping and depression.[2] Kim Heizer noted that Ms. Melton struggles in many areas of her life, particularly focusing on "proper relationship structure". (Filing No. 12-8 at 49.)

On March 14, 2012, psychologist Michelle Lamb, Psy.D. ("Dr. Lamb"), evaluated Ms. Melton and diagnosed depression, generalized anxiety disorder, and post-traumatic stress disorder. (Filing No. 12-8 at 56-61.) Dr. Lamb assigned Ms. Melton a GAF score of 55 and noted that Ms. Melton had limited concentration "per report" and exhibited poor judgment "based on living arrangement choices". (Filing No. 12-8 at 57.) However, Dr. Lamb considered Ms. Melton to be alert, fully oriented, with intact memory, appropriate and cooperative, and having a logical and sequential thought process. Dr. Lamb further noted no suicidal or self-mutilation ideations or plans. (Filing No. 12-8 at 59.)

On April 5, 2012, Dr. Philip Borders ("Dr. Borders") evaluated Ms. Melton and diagnosed major depression with psychotic features, polysubstance abuse, eating disorder not otherwise specified, and borderline personality disorder. (Filing No. 12-8 at 63-64.) Dr. Borders assigned Ms. Melton a GAF score of 45 and found that Ms. Melton had poor insight and poor judgment at times. (Filing No. 12-8 at 64.) Further, although Dr. Borders noted that Ms. Melton had no suicidal plans, she had suicidal thoughts, engages in "some cutting behavior", and that she reported hearing

---

[2] Kim Heizer's one page report is the same as "Exhibit No. 9F", which Ms. Melton argues was not properly introduced to the medical expert during the hearing.

a voice telling her to hurt herself "every once in a while". *Id.* Dr. Borders concluded that Ms. Melton had "significant psychiatric difficulties". *Id.*

On October 10, 2012, Dr. Lamb noted that Ms. Melton was "overall doing well," noting that she reported only a "couple depressed mood days, no cutting or burning for a year, little anxiety because not living with mother, . . . [and] anger is almost non-existent since started on meds". (Filing No. 12-8 at 70.) Dr. Lamb noted that Ms. Melton also stated that she did not want a job because she wanted to keep her time free, and that she was volunteering three times a week at a juvenile detention center. *Id.*

On December 4, 2012, Dr. Borders diagnosed Ms. Melton with borderline personality disorder and psychotic disorder NOS, but noted that she had no current psychosis. (Filing No. 12-8 at 73-75.) On January 29, 2013, Dr. Borders again diagnosed Ms. Melton with borderline personality disorder but he did not diagnose a psychotic disorder.[3] (Filing No. 12-8 at 76.)

On March 19, 2013, Dr. Lamb diagnosed Ms. Melton with major depressive disorder, generalized anxiety disorder, psychotic disorder NOS, and borderline personality disorder. (Filing No. 12-8 at 51.) On the same day, Dr. Lamb prepared a RFC assessment finding that Ms. Melton would have marked limitation in 11 out of 20 work related activities.[4] (Filing No. 12-8 at 51-53.) Specifically, Dr. Lamb noted marked limitations in Ms. Melton's ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to interact appropriately

---

[3] Dr. Borders' most recent treatment note is part of "Exhibit No. 10F", which Ms. Melton argues was not properly introduced to the medical expert during the hearing.
[4] Dr. Lamb's RFC assessment is part of "Exhibit No. 10F", which Ms. Melton argues was not properly introduced to the medical expert during the hearing.

5

with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (Filing No. 12-8 at 52-53.) Dr. Lamb concluded that Ms. Melton was not able to maintain employment. (Filing No. 12-8 at 54.)

On April 12, 2013, during Ms. Melton's hearing, the ALJ read Kim Heizer's report, Dr. Borders' most recent treatment note, and Dr. Lamb's RFC word-for-word to psychiatrist Ashok Khushalani, M.D. ("Dr. Khushalani"), who served as a medical expert at the hearing. *Compare* Filing No. 12-8 at 49 *with* Filing No. 12-2 at 35-36. *Compare* Filing No. 12-8 at 50-51 *with* Filing No. 12-2 at 36-37. *Compare* Filing No. 12-8 at 52-54 *with* Filing No. 12-2 at 37-38. With the exception of those documents read to him by the ALJ, Dr. Khushalani also reviewed the rest of the evidence in the record. (Filing No. 12-2 at 43.) Thereafter, Dr. Khushalani testified that Ms. Melton had consistently been diagnosed with some aspect of a mood disorder, noting prior diagnoses of major depressive disorder with psychotic features, borderline intellectual functioning, and psychotic disorder NOS. (Filing No. 12-2 at 43.)

Dr. Khushalani opined that Ms. Melton did not meet or medically equal any listings. (Filing No. 12-2 at 44.) In particular, Dr. Khushalani testified that Ms. Melton did not meet listing 12.04 because "she's reasonably stabilized on the medicine[,] . . . has not had any history of hospitalizations in that time period[, and is] in the process of getting married." *Id.* Further, Dr. Khushalani opined that Ms. Melton did not meet listing 12.05 because her higher IQ scores "negate[d] the low scores", potentially demonstrating that the lower IQ scores were the result of "an incapacity" such as attention deficit hyperactivity disorder, medicine, or distractibility. *Id.*

6

### C. ALJ's Decision

In her Decision, the ALJ found that Ms. Melton had not engaged in substantial gainful activity since August 16, 2010, the alleged onset date. (Filing No. 12-2 at 14.) The ALJ concluded that Ms. Melton had severe impairments but that her impairments did not, singly or in combination, meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. (Filing No. 12-2 at 15.) The ALJ began her listing analysis by individually naming listings 12.02, 12.04, and 12.05 and noting that two of the requisite criteria were identical for each of the listings. (Filing No. 12-2 at 15.) Thereafter, the ALJ spent nearly four pages evaluating the identical criteria and the additional requirements of listing 12.05. (Filing No. 12-2 at 15-18.)

Thereafter, the ALJ found that Ms. Melton had the RFC to perform the full range of work at all exertional levels but the following non-exertional limitations: "the claimant is limited to simple repetitive 1 and 2 step tasks with only occasional public contact and occasional superficial contact with supervisors and co-workers." (Filing No. 12-2 at 18.) In making her RFC finding, the ALJ spent nearly seven pages considering and discussing the relevant evidence. (Filing No. 12-2 at 18-24.) While the ALJ determined that Ms. Melton had no past relevant work, the ALJ concluded, based on this RFC and the Vocational Expert's testimony, that Ms. Melton could still perform a significant number of jobs in the national economy. (Filing No. 12-2 at 24-25.) As a result, the ALJ determined that Ms. Melton was not disabled. (Filing No. 12-2 at 26.)

## II. LEGAL STANDARD

### A. Disability Determination

Under the Social Security Act, a claimant is entitled to DIB or SSI if she establishes she has a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382 (2012). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A) (2012).  To justify a finding of disability, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2012).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  *Id*.  At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

At step three of the sequential analysis, the ALJ must determine whether the claimant's impairment or combination of impairments meets or equals the criteria for any of the conditions included in 20 C.F.R. Part 404, Subpart P, App'x 1 (the "Listings").  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1.  The listings are medical conditions defined by criteria that the Social Security Administration has pre-determined to be disabling.  *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); 20 C.F.R. §§ 404.1525(a), 416.925(a).  *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1.  For each listing, there

are objective medical findings and other findings that must be met or medically equaled to satisfy the criteria of that listing. 20 C.F.R. §§ 404.1525(c)(2)-(5), 416.925(c)(2)-(5).

If the claimant's impairments do not meet or medically equal a listing, then the ALJ assesses the claimant's RFC for use at steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(a)(4)(iv). Residual functional capacity is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008); 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1).

At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the ALJ determines whether the claimant can perform any other work in the relevant economy, given her RFC and considering her age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). *See also* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2012). The claimant is not disabled if she can perform any other work in the relevant economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2012). The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process. 42 U.S.C. §§ 423(d)(2)(B); 1382c(a)(3)(G) (2012). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**B.      Review of the Commissioner's Final Decision**

When the Appeals Council denies review, the ALJ's ruling becomes the final decision of the Commissioner. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). Thereafter, in its review, the district court will affirm the Commissioner's findings of fact if they are supported by substantial evidence. 42 U.S.C. § 405(g)(2012); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Dixon v. Massanari*, 270 F.3d

1171, 1176 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon*, 270 F.3d at 1176; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). *See also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (Substantial evidence must be "more than a scintilla but may be less than a preponderance.").

In this substantial-evidence determination, the district court does not decide the facts anew, re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Accordingly, if the Commissioner's decision is adequately supported and reasonable minds could differ about the disability status of the claimant, the court must affirm the decision. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Ultimately, the sufficiency of the ALJ's articulation aids the court in its review of whether the Commissioner's final decision was supported by substantial evidence. *See Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do."). While, the ALJ need not evaluate every piece of testimony and evidence submitted in writing, the ALJ's decision must, nevertheless, be based upon consideration of all the relevant evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). In this vein, the ALJ may not discuss only that evidence that favors her ultimate conclusion but must confront evidence that contradicts her conclusion and explain why the evidence was rejected. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

Further, the ALJ's decision must adequately demonstrate the path of reasoning, and the evidence must lead logically to the ALJ's conclusion. *Terry*, 580 F.3d at 475; *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Indeed, to affirm the Commissioner's final decision, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski v. Halter*, 245 F.3d 881, 888–89 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

### III.  DISCUSSION

Ms. Melton alleges that the ALJ committed multiple errors when assessing whether her impairments met or medically equaled listing 12.03.[5] First, Ms. Melton asserts that the ALJ erred by not discussing the listing by name. Second, Ms. Melton argues that the ALJ did not sufficiently apprise the medical expert of the record evidence when he read the evidence directly to the medical expert. Third, Ms. Melton contends that the ALJ misstated and failed to properly consider her global assessment of functioning GAF scores.

At step three of the sequential analysis, the ALJ must determine whether the claimant's impairment or combination of impairments meets or equals the criteria for any of the conditions included in 20 C.F.R. Part 404, Subpart P, App'x 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1. The listings are medical conditions defined by criteria that the Social Security Administration has pre-determined to be disabling. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); 20 C.F.R. §§ 404.1525(a), 416.925(a). *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1. For each listing, there are objective

---

[5] To begin, this Court notes that Ms. Melton's brief makes it difficult to determine whether these arguments are asserted as errors made pursuant to the ALJ's listing determination or errors made pursuant to the ALJ's RFC determination. Because Ms. Melton's argument is most developed regarding the ALJ's failure to consider Dr. Lamb's RFC assessment and Dr. Bolton's GAF score in relation to listing 12.03, this Court construes Ms. Melton's argument as a listing challenge. Nevertheless, in an abundance of caution, this Court will also briefly discuss the weight the ALJ afforded to this evidence as part of this Court's review.

11

medical findings and other findings that must be met or medically equaled to satisfy the criteria of that listing.  20 C.F.R. §§ 404.1525(c)(2)-(5), 416.925(c)(2)-(5).

**A.     The ALJ did not err in failing to individually discuss listing 12.03.**

First, Ms. Melton asserts that the ALJ erred by not discussing Listing 12.03, Schizophrenic, Paranoid, and Other Psychotic Disorders.  20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.03.  The Commissioner responds that the ALJ did not have a duty to discuss the listings because Ms. Melton failed to demonstrate that her impairments satisfy the relevant criteria.  This Court agrees.

A claimant has the initial burden of presenting medical evidence to demonstrate that his impairments satisfy all of the requirements in a listing.  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Knox v. Astrue*, 327 Fed. App'x 652, 655 (7th Cir. 2009) (unpublished opinion) ("Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing").  Thereafter, the ALJ also has a duty to mention the specific listing he is considering and offer more than a perfunctory analysis.  *Ribaudo*, 458 F.3d at 583 (internal quotations omitted); *Barnett*, 381 F.3d at 668.

Listing 12.03 applies when a claimant has a schizophrenic, paranoid, or other psychotic disorder, characterized by the onset of psychotic features with deterioration from a previous level of functioning.  20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.03.  To be found disabled under this listing, Ms. Melton must satisfy the requirements of either Subparts A and B or Subpart C.  20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.03.

As a threshold matter, although Ms. Melton was repeatedly diagnosed as having a psychotic disorder NOS, she does not identify any evidence to suggest that her psychosis caused a requisite deterioration in functioning.  Further, this Court can find no medical opinion to

12

substantiate such a deterioration in functioning, or to substantiate that such a deterioration was primarily on account of Ms. Melton's psychosis. In addition, Ms. Melton does not identify where she apprised the ALJ of such a deterioration during her hearing, such that it should have triggered the ALJ to substantively evaluate the listing. *See generally* (Filing No. 12-2 at 31-63) (Ms. Melton's attorney argues that listings 12.04 and 12.05 apply but never mentions listing 12.03.) Thus, it appears that Ms. Melton did not meet her primary burden, either before the ALJ or this Court, of showing that her impairments satisfy the criteria specified in the listings. *Ribaudo*, 458 F.3d at 583; *Knox*, 327 Fed. App'x at 655.

Nevertheless, even assuming Ms. Melton's repeated diagnosis of "psychosis NOS" was alone sufficient to meet the threshold deterioration requirement and that Ms. Melton's single identified treatment note of auditory hallucinations, (Filing No. 12-8 at 63-64), was sufficient to satisfy the Subpart A requirements of "medically documented persistence, either continuous or intermittent, of . . . delusions or hallucinations", this Court concludes that Ms. Melton still cannot establish the Subpart B requirements of the listing.[6]

Under the Subpart B requirements of listing 12.03, Ms. Melton must establish that her psychosis resulted in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration". 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.03.

---

[6] Ms. Melton makes no assertion that she satisfies the Subpart C requirements, and only minimally asserts that she meets the requirements of Subparts A and B. *See* Filing No. 17 at 7-8. Further, Ms. Melton does not identify any evidence to support that she meets the Subpart C requirements. To satisfy Subpart C, Ms. Melton would have to demonstrate "[r]epeated episodes of decompensation, each of extended duration; [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. *See* 20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.03

The ALJ began her step 3 analysis by naming listings 12.02, 12.04, and 12.05. (Filing No. 12-2 at 15.) Before proceeding with her analysis, however, the ALJ paused to note that one Subpart criteria was identical for each of the named listings. (Filing No. 12-2 at 15) ("In making this finding the undersigned has considered whether the "paragraph B" criteria ("paragraph D" criteria of listing 12.05) are satisfied.").

This Court notes that the ALJ was correct in recognizing that the requirements for Subparts 12.02B, 12.04B, and 12.05D are identical. *See* 20 C.F.R. Part 404, Subpart P, App'x §§ 12.02, 12.04, 12.05. What the ALJ neglected to mention, however, is that the requirements for Subpart 12.02C, 12.04C, and 12.05C are also identical. *See* 20 C.F.R. Part 404, Subpart P, App'x §§ 12.02, 12.04, 12.05. In addition, this Court notes that the identical language is also found in Subparts 12.03B and 12.03C. *See* 20 C.F.R. Part 404, Subpart P, App'x § 12.03.

Thereafter, the ALJ engaged in a very thorough discussion of the identical requirements for Subparts B and C in her opinion. (Filing No. 12-2 at 15-18.) Indeed, the Court notes that the ALJ spent nearly four pages of her opinion evaluating the identical criteria. *Id.* Accordingly, it appears that, even if the ALJ should have identified listing 12.03 by name, the analysis the ALJ provided for the three listings he did specifically address would have also applied to listing 12.03.

As a result, this Court finds that the ALJ's failure to specifically name 12.03, if an error, was a harmless one. *See Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits"); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision"). *See also Salt River Project Agric. Improvement and Power Dist. v. U.S.*, 762 F.2d 1053, 1060 n. 8 (D.C. Cir.

1985) ("When it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming.").

Further, a review of the ALJ's decision reveals that she conducted a complete and thorough review of Subpart B and C criteria found in listing 12.03. (Filing No. 12-2 at 15-18.) With respect to the Subpart B requirements, the ALJ concluded that Ms. Melton had no restrictions of daily living, citing Ms. Melton's exhibits 4F, and 10F. (Filing No. 12-2 at 15.) In addition, the ALJ concluded that Ms. Melton had moderate difficulties in social functioning, citing Ms. Melton's exhibits 1F-3F, 5F, and 10F. *Id*. The ALJ also concluded that Ms. Melton had moderate difficulties in concentration, persistence, and pace, citing Ms. Melton's exhibits 4E, 4F, and 10F and that Ms. Melton had no episodes of decompensation. (Filing No. 12-2 at 16.)

The Court considers this analysis to be well-developed and adequately supported by evidence in the record. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) ("The ALJ is not required to mention every piece of evidence but must provide an accurate and logical bridge between the evidence and the conclusion"); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 1997) (noting that an ALJ "must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning."). Consequently, the Court concludes that the ALJ did not err by failing to specifically assess whether Ms. Melton's impairments met or equaled listing 12.03.

**B.      The ALJ sufficiently apprised the medical expert of the record evidence.**

Second, Ms. Melton argues that the testimony of medical expert, Dr. Khushalani, was not adequately supported because the ALJ read evidence to Dr. Khushalani rather than letting him read it during the hearing. Specifically, Ms. Melton criticizes the ALJ for reading Dr. Borders' most recent treatment notes, Kim Heizer's treatment notes, and Dr. Lamb's RFC assessment to Dr. Khushalani. As a result, Ms. Melton argues that it was an error for the ALJ to give Dr.

Khushalani's opinions significant weight. Despite Ms. Melton's assertions, however, this Court again finds no error.

To begin, Ms. Melton cites no authority, regulation or otherwise, to support her arguments that the ALJ had a duty to allow Dr. Khushalani to read the exhibits or that the ALJ was not permitted to read them during the hearing. *See Boyanowski v. Colvin*, 1:12-CV-139, 2013 WL 3353947, at *8 (N.D. Ind. 2013)("Undeveloped arguments may be treated as waived . . .").

Further, it appears that the ALJ may have chosen to read the exhibits rather than give them to Dr. Khushalani because the exhibits were submitted by Ms. Melton's counsel only days before the hearing. (Filing No. 12-2 at 34-35.) Regarding the exhibits at issue here, the hearing transcript states in relevant part,

> Well, Mr. Mulvany, let's see when we got those exhibits. We just received those on April 3rd, and the San Jose procedures, which they should have – your office should have gotten a letter about this, not related to any particular case, but just a general procedure letter that says if you're going to submit documents within ten days of the hearing, it's the representative's responsibility to get those documents to the doctor.

*Id*. In response, Ms. Melton's attorney asserts that the exhibits were not necessary to Ms. Melton's case, and attempted to move on with the hearing without admitting them. Specifically, Ms. Melton's attorney states, "We understand, Judge, but the evidence in the Agency file up through 5-F, proves [Melton's] case." *Id*. Nevertheless, the ALJ decided to admit the late-filed exhibits into the record anyway, asserting "well let me tell the doctor what's in the entire record." *Id*.

This exchange is extremely puzzling, given Ms. Melton's argument to this Court that the ALJ failed to adequately build and develop the record evidence when questioning the medical expert, Dr. Khushalani. Indeed, Ms. Melton's argument is in no way supported by the facts of this case.

In addition, this Court has difficulty understanding how the ALJ's reading of the evidence was prejudicial to Ms. Melton's case when the record reflects that the ALJ read all three documents nearly word-for-word during the hearing. *Compare* (Filing No. 12-8 at 49) *with* (Filing No. 12-2 at 35-36.) *Compare* (Filing No. 12-8 at 50-51) *with* (Filing No. 12-2 at 36-37.) *Compare* (Filing No. 12-8 at 52-54) *with* (Filing No. 12-2 at 37-38.)

Further, the hearing testimony makes clear that Dr. Khushalani reviewed the rest of the record evidence, (Filing No. 12-2 at 34, 43.), and was familiar enough with all of the evidence to cite to different exhibits during his testimony, including the portions read to him by the ALJ, (Filing No. 12-2 at 47, 50.) Consequently, because it appears that Dr. Khushalani was sufficiently apprised of all the record evidence, this Court concludes that the ALJ did not error in reading the evidence and that the ALJ was justified in giving Dr. Khushalani's testimony significant weight.

C.      **The ALJ adequately considered Ms. Melton's GAF scores.**

Third, Ms. Melton argues that the ALJ misstated and failed to properly consider her GAF scores.[7] In particular, Ms. Melton asserts that the ALJ improperly characterized Dr. Schmutte's assigned GAF score of 50 as indicative of "moderate" symptoms, rather than "serious" symptoms,

---

[7] The Court notes that the most recent version of the *Diagnostic & Stat. Manual of Mental Disorders* ("DSM"), no longer uses GAF scores. *See* Am. Psychiatric Ass'n, *Diagnostic & Stat. Manual of Mental Disorders*, 16 (5th ed., 2013) ("*DSM-V*") ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice.").

According to the previous version of the DSM, however, GAF scores were previously used to measure a clinician's judgment of the individual's overall level of functioning, regarding psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic & Stat. Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). The higher the GAF score, the better the individual's overall level of functioning. *Id.*

For instance, a GAF score of 41-50 indicated "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id*. A GAF score of 51-60 indicated "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id*. A GAF score of 61-70 indicated "some mild symptoms" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well . . . ." *Id*. A GAF score of 71-80 indicated that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . [and] no more than slight impairment in social, occupational, or school functioning." *Id*.

17

as indicated in the DSM-IV-TR[8]. (Filing No. 12-2 at 20; Filing No. 12-7 at 75.) In addition, Ms. Melton asserts that the ALJ did not consider Dr. Borders' assigned GAF score of 45. (Filing No. 12-8 at 64.) In her opening brief, Ms. Melton argues that these GAF scores, by themselves, evidence opinions by Dr. Schmutte and Dr. Borders that Ms. Melton could not work. (Filing No. 17 at 2.) Again, however, this Court finds no error.

To begin, the Social Security Administration and courts within this Circuit have repeatedly opined that a claimant's GAF scores, while used to make treatment decisions, do not directly correlate with the severity requirements of the regulations and that the ALJ is therefore not bound by them when determining disability. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, at 50764-50765 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings"); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Wilkins v. Barnhart*, 69 Fed. App'x 775, 780 (7th Cir. 2003) (unpublished); *Sparks v. Colvin*, 1:14-CV-1519; 2015 WL 3618344, at *6 (S.D. Ind. 2015) ("The [GAF] score has limited value in determining whether a [claimant] can engage in substantial gainful activity."). Accordingly, this Court does not agree with Ms. Melton's contention that the low GAF scores are the same as binding medical opinions suggesting her inability to work.

In addition, it cannot be said that the ALJ failed to consider Ms. Melton's GAF scores. Indeed, in her opinion, the ALJ identified and assessed no less than four different GAF scores. *See* (Filing No. 12-2 at 19) (noting a GAF score of 38, indicating "severe symptoms"); (Filing No. 12-2 at 20) (noting a GAF score of 50); (Filing No. 12-2 at 21) (noting a GAF score of 55, indicating

---

[8] *Id*.

18

<s />

"moderate symptoms"); (Filing No. 12-2 at 22) (noting a GAF score of 45, indicating "severe symptoms").

As Ms. Melton notes, the ALJ incorrectly stated that the Dr. Bolton's GAF score of 50 score indicated "moderate" rather than "severe" symptoms. However, this Court does not consider this to be prejudicial, given the ALJ's robust analysis of the remaining GAF scores. *See Sparks*, 2015 WL 3618344, at *7. The ALJ need not evaluate every piece of testimony and evidence submitted in writing, but must adequately articulate her analysis and sufficiently support her conclusion. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Here, the ALJ's thorough discussion of the record evidence, including Ms. Melton's GAF scores, was seven pages long. (Filing No. 12-2 at 18-24.). This evidentiary discussion was more than sufficient. *See Salt River Project Agric. Improvement and Power Dist.*, 762 F.2d at 1060 n. 8 ("When it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming.").

Accordingly, this Court considers remand to be inappropriate in this case.

## IV. <u>CONCLUSION</u>

In sum, the ALJ did not err in not individually evaluating listing 12.03; the ALJ sufficiently apprised the medical expert of the record evidence, and the ALJ adequately considered Ms. Melton's GAF scores. For these reasons, the Court **DENIES** Ms. Melton's request for remand and **AFFIRMS** the Commissioner's final decision. (Filing No. 1.)

**SO ORDERED.**

Date: 9/14/2015

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov